UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ANDY LI,

        Plaintiff,

    v.

CONTRA COSTA COUNTY, et al.,

        Defendants.

Case No. 16-cv-02861-EMC

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, AND DISMISSING UNSERVED DEFENDANTS**

Docket No. 20

## I.    INTRODUCTION

In this *pro se* prisoner's civil rights action, Andy Li contends that Defendants were deliberately indifferent in their responses to his complaints of pain and his need for eye care. Six defendants were sued in this action, but only three Defendants (i.e., County of Contra Costa, Sam Rosales, and Harjinder Dhanoa) have appeared in this action. These three Defendants have filed a motion for summary judgment, which Mr. Li has opposed. For the reasons discussed below, Defendants' motion will be granted in part and denied in part. The Court also will dismiss the unserved Defendants and refer this case to the *Pro Se* Prisoner Mediation Program.

## II.    BACKGROUND

The following facts are undisputed unless otherwise noted.

A.    The Parties

The events and omissions giving rise to Andy Li's complaint occurred in the time period from October 2015 through February 2017. At all relevant times, Andy Li was a federal pretrial detainee, housed at the Martinez Detention Facility ("MDF") in Martinez, California.

MDF is a jail in Contra Costa County.

Harjinder Dhanoa apparently was a registered nurse at MDF. Docket No. 24-1 at 7.

Samuel Rosales was the Health Services Administrator for Detention Health Services for Contra Costa County. Mr. Rosales served as the "liaison between the Sheriff's Office and Health Services regarding the provision of health services in the County's detention facilities." Docket No. 23 at 1. He developed and oversaw the updates of policy for the administration of health care in the detention setting. *Id.* at 2.

B.      Some Background Information About Vision Testing

A person's vision may be measured in terms of his "visual acuity." Defendants' expert ophthalmologist, Dr. Shah, discussed visual acuity in his declaration.

> Visual acuity is the clarity or sharpness of a person's vision. Perfect visual acuity is defined as 20/20 vision in both eyes; however, based on population bell shaped averages, this does not represent normal for everyone, as some may be better and some worse than this in their corrected state. This means that with normal visual acuity, a person should be able to see clearly at 20 feet what should normally be seen at that distance. [¶] A person with 20/40 vision means a person must be as close as 20 feet to see what a person with normal vision can see at 40 feet. For a typical person, 20/30 to 20/80 vision may be sufficient to function with activities of daily living. The California Department of Motor Vehicles' vision screening standard is 20/40 vision with or without corrective lenses.

Docket No. 22 at 6.

The familiar chart on the wall used to check visual acuity is called a Snellen chart. "It uses 11 lines of block letters on a 5x5 grid, ranging from a single large letter on the top line to several letters in decreasing sizes in subsequent rows. This test is administered at 20 feet in the United States and approximates visual acuity based on the smallest row that can be read accurately." Docket No. 22 at 3 n.2.

C.      Contra Costa's Policies Regarding Eye Care and Pain Medications

Contra Costa County Detention Health Services had a policy regarding vision screening and care for inmates. Docket No. 23 at 3. This policy was in effect when Mr. Li sought an optometry appointment. The policy provided that an inmate requesting glasses or an eye exam would be assessed to determine if he qualified to be put in the line for an optometry appointment:

> A.      The inmate/ward/patient will request eye examination and/or glasses using the Sick Call Request form or the Triage/Advice phone.

2

B.      The Sick Call nurse will assess vision of the patient using the Snellen eye chart.  If vision is 20/40 or worse or 20/10 or worse, refer to the MD.  Optometry is an impacted clinic.  Advise the patient it can take several months to get an appointment with optometry if the MD orders one.

C.      The provider will review the vision screening and, if indicated, a referral will be made to Contra Costa Regional Medical Center (CCRMC) clinic for refraction.

Docket No. 23-1 at 2-3.  The parties agree that Mr. Li met the minimum standards on visual acuity for a referral to the CCRMC optometry clinic and was referred to the clinic the day after he had his eyes tested with the Snellen eye chart.  Docket No. 23 at 3.

Contra Costa County Detention Health Services had a policy regarding addressing inmates' complaints of "minor discomfort."  Docket No. 23 at 3.  The policy defined "minor discomfort" as including "pains, aches, nausea and other discomforts which are temporary in nature and do not significantly limit activities of daily living.  Minor discomforts include headache, myalgias, muscle strain, menstrual cramps[,] minor soft tissue trauma, old fractures, mild arthritis, indigestion, etc."  Docket No. 23-2 at 2.  The policy excluded people with certain diseases, allergies, and other conditions, but apparently applied to run-of-the-mill complaints from other inmates.  The policy stated the following pain relief plan for "[m]inor pain/headache/menstrual cramps/muscle strain, gastric upset, fever and so on:"

Pain -
- Acetaminophen (Tylenol) 325 mg., 1 or 2 tabs po.  May order as little as one dose or B.I.D. or T.I.D., prn for up to 5 days. . . . .  OR
- Ibuprofen 200 mg., 2 tabs.  May order as little as one does or B.I.D. or T.I.D., prn for up to 5 days. . . .

Docket No. 23-2 at 2-3.  The "minor discomfort" policy also allowed medical staff to provide ice packs or warm packs for up to 5 days, different medications for gastric upset, and for inmate education that included "[t]o return if pain worsens or continues beyond 3 days."  *Id.* at 3.

Contra Costa County Detention Health Services also had a policy for the administration of several different kinds of medications to inmates.  Docket No. 23 at 4.  For over-the-counter medications, the providers were to advise patients to obtain over-the-counter medications from the commissary.  Docket No. 23-3 at 13.  Common over-the-counter medications were available to the indigent inmates as well as those who had money in their accounts.  *Id.*  The policy also allowed

3

medical staff to provide over-the-counter pain medication in cases where there was an acute or

urgent condition and it was unacceptable to wait for the medication until the next commissary day.

*Id.*

D.    Mr. Li's Medical Requests and Grievances

On October 22, 2015, Mr. Li submitted a written request for a copy of the prescription for

his glasses from his medical file.  Docket No. 28 at 33.  The request did not mention any pain or

need for an eye examination.  The written response, dated October 23, 2015, directed him to "use

phone triage system to access medical."  *Id.*  The medical records indicate that nurse Kick

informed Mr. Li that MDF did not have medical records from other jails unless they came with the

inmate.  Docket No. 24-1 at 8.

The parties disagree as to whether Mr. Li complained in November 2015 to nurse Dhanoa

that he was in pain.  Mr. Li states in his verified complaint that he "spoke[] to Harjinder Dhanoa

and Joy Kick about the pains [he was] experiencing.  They said they'll consult doctor Dennis

McBride about it, no pain medications were provided."  Docket No. 1 at 3.[1]

On January 14, 2016, a nurse conducted a Snellen eye chart test on Mr. Li.  The results

showed that his vision was 20/40 with glasses, and 20/100 without eyeglasses.  Docket No. 24-1 at

6.  Mr. Li presents evidence that, for the Snellen eye chart test and for many months thereafter, he

was wearing a pair of eyeglasses he recently had borrowed from another inmate.[2]  *Id.* at 2-3.

There is no evidence Mr. Li told the nurse that he was wearing borrowed glasses when he did the

---

[1] The medical records show that, on November 10, 2015, Mr. Li called the triage line and
informed nurse Dhanoa that he had a prescription for eyeglasses from his last jail, his glasses were
broken, and he wanted eyeglasses.  Docket No. 24-1 at 7-8.  The medical records indicate that
nurse Dhanoa planned to "get roi for prescription."  *Id.* at 8.  (ROI may stand for "release of
information."  *See* Docket No. 28 at 79.)  It is unclear whether this was the same conversation
recounted in Mr. Li's complaint.  For purposes of ruling on Defendants' motion for summary
judgment, the Court accepts Mr. Li's version as true, i.e., that the nurses provided no pain
medications in response to his complaints of pain**.**

[2] Mr. Li presented a declaration from inmate Kam Wong, who declared that he loaned to Mr. Li an
old pair of his (Wong's) prescription eyeglasses to use to see at a "distance" while Mr. Li waited
for his optometry exam.  Docket No. 28 at 79.  According to Mr. Wong, Mr. Li tried the glasses
on and "stated he sees good with them and it's usable."  *Id.*  Also according to Mr. Wong, Mr. Li
was still wearing those glasses on November 30, 2016, when he was hit in the face by another
inmate, and the glasses were broken.  *Id.*

4

1  Snellen eye chart test.[3]

2     The next day, January 15, 2016, Dr. McBride referred Mr. Li to the optometry clinic at

3  Contra Costa Regional Medical Center (CCRMC).  Docket No. 24-1 at 5.  The medical record

4  does not indicate any level of priority for the referral.  A medical record apparently electronically

5  signed on that date by Dr. McBride lists "[p]rofound vision impairment, one eye" as the diagnosis,

6  and states "[v]ision impairment" in the "comments" section.  Docket No. 28 at 32.

7     On April 27, 2016, Mr. Li submitted a medical grievance stating:  "I requested for

8  optometrist eyes exam in November 2015.  I still have not received my examination.  *I am starting*

9  *to have pains in my eye balls, due to constant straining to see.*  Can the doctors please give me

10  some pain medications to alleviate my pains for now, while I continues to wait?"  Docket No. 28

11  at 63 (errors in source, emphasis added).  The written response that day directed Mr. Li to "use

12  phone triage system to access medical."  *Id.*  According to Mr. Li, he used the triage phone and

13  restated his problems, but "no actions were taken by RN Felisa."  Docket No. 1 at 3.

14     On May 3, 2016, Mr. Li submitted a medical request directed to Mr. Rosales, the Health

15  Services Administrator, stating:

16          I have been waiting for my optometry eyes examination since
           November 2015.  My eyes are starting to hurt and experiencing
17          headaches due to constant straining of my eyes to see.  I have asked
           the nurses on triage phone calls and through grievance for some pain
18          medications to help alleviate my pains while I am still waiting for
           my optometry appointment.  Your medicals staffs (nurses & doctor)
19          here at MDF flat out denies my requests for pain medications and
           still have not given me anything at all that would help me lesson my
20          pains.

21  Docket No. 28 at 66 (errors in source).  Mr. Rosales sent a written response the next day,

22  explaining that the medical records indicated that a nurse did an eye exam on January 14, 2016,

23  and a doctor had made a referral on January 15, 2016, for Mr. Li to be seen at the optometry clinic.

24  *Id.* at 67.  Mr. Rosales informed Mr. Li that "there are long wait times for all patients to get

25  _____

26  [3] The medical records do not mention that Mr. Li was wearing borrowed glasses, and Defendants'
   motion appears to assume that Mr. Li was wearing his own glasses at the time he took the Snellen
27  eye chart test.  The nurse conducting the Snellen eye chart test wrote that Mr. Li had "prescription
   eyeglasses that is 4 mos. old."  Docket No. 24-1 at 6.  Defendants' expert, Dr. Shah, states that the
28  result of the test was that Mr. Li had "20/40 while wearing his current prescription glasses."
   Docket No. 22 at 3.

appointments at the County's Optometry Clinics," and that Mr. Rosales would check into (a) obtaining Mr. Li's eyeglass prescription from his former jail and (b) how Mr. Li might obtain reading glasses for the short term.  Mr. Rosales also explained that Mr. Li could "obtain over the counter pain medications (Tylenol, Motrin) from commissary -- even if you don't have money on your books, you can order over the counter pain medications, Health Services covers the cost for inmates that don't have money on their books."  *Id.*  There is no evidence that Mr. Rosales actually provided pain medications to Mr. Li.  *See* Docket No. 28 at 6-7.  According to the medical records, nurse Felisa spoke to Mr. Li on May 6, 2016, and reviewed with him the inmate appeal response from Mr. Rosales that explained he could purchase Tylenol or Ibuprofen from the commissary; Mr. Li stated he understood the response.  Docket No. 24-1 at 5.

There is no evidence in the record that Mr. Li ever attempted to, or did, obtain Tylenol or Motrin (i.e., ibuprofen) from the jail's commissary.

Mr. Li was punched in the face by another inmate on November 30, 2016.  Docket No. 22 at 4.  The eyeglasses he was wearing were broken and cut his face.  Mr. Li also reported a loss of vision to his left eye as a result of the punch.  He was taken to CCRMC that day, where he initially was examined in the emergency department and later by an ophthalmologist.  Mr. Li was diagnosed with a hyphema (i.e., a collection of blood between the cornea and the iris), commotio retinae (i.e., damage to the outer retinal area), and a laceration to his left eye.  At the ophthalmology exam, his vision was limited due to the trauma from being punched.  *Id.* at 5. His uncorrected visual acuity was measured in both eyes as 20/100, and 20/40 in his right eye and 20/50 in his left eye using a pinhole scope.  *Id.*

On December 1, 2016, Mr. Li was seen by a nurse for complaints of facial and eye pain from the recent altercation.  The nurse informed the on-call doctor.  Naproxen was prescribed for Mr. Li.  *Id.*

On December 27 and 28, 2016, a deputy from the U.S. Marshal's office in San Francisco inquired about Mr. Li's optometry appointment because Mr. Li (who was a federal pretrial detainee) had complained about waiting a year for an optometry appointment.  Docket No. 28 at 26.  On December 28, 2016, the deputy marshal "was given info regarding the patient's recent eye

1    appointment, the need for a follow up appointment, that the patient was on eye medication," and

2    that the nurse would follow up as to the next ophthalmology appointment.  *Id.* at 26.

3         On December 30, 2016, Mr. Li was seen by an ophthalmologist at CCRMC for a follow-up

4    examination for the November 30 eye injury.  Docket No. 22 at 5.  The medical records show that

5    the retinal swelling and hyphema had resolved.   Mr. Li's uncorrected visual acuity was measured

6    in both eyes at 20/200 and 20/50 in his right eye and 20/70 in his left eye using the pinhole scope.

7    Mr. Li was referred to the optometry clinic again because his glasses had been broken in the

8    altercation.

9         On February 9, 2017, Mr. Li called the MDF telephone triage, complaining about eye

10   pain/strain.  The nurse noted his red eyes, and the doctor prescribed Liquifilm tears.

11        Also on February 9, 2017, Mr. Li filed a medical grievance stating that he had still not

12   been seen by an optometrist, although he had been waiting thirteen months.  Docket No. 28 at 69.

13   He further wrote that his glasses had been broken when he was punched by another inmate on

14   November 30, 2016, and that he was now without glasses.  *Id.*  He wrote:  "I have to strain and

15   squinting to see visually.  Doing this constantly causing my eyes to be blurry at time, redness and

16   a little sore and dizzy.  Can you please alleviate my eye problems with appointment and pain

17   medications for eye soreness (pains)?"  *Id.* (errors in source).

18        Mr. Li finally had his optometry appointment[4] on February 17, 2017.  Docket No. 22 at 5.

19   Mr. Li was seen by Sharman Wong, O.D., who noted that Mr. Li's uncorrected visual acuity was

20   measured in both eyes at 20/200 and 20/50 in his right eye and 20/60 in his left eye using the

21   pinhole scope.  Docket No. 24-1 at 32-37.  Mr. Li needed glasses for distance, but not for reading.

22   The power prescribed was approximately -2.75 diopter spherical equivalent in the right eye and -

23   3.50 diopter spherical equivalent in the left eye.  Docket No. 22 at 6.  According to Defendant's

24   expert, Dr. Shah, "[t]his does not represent a large magnitude change," but he does not elaborate

25   on that statement.   Docket No. 22 at 6. Mr. Li's new prescription glasses were ordered on

26   February 22, 2017.  Docket No. 24-1 at 31.

27   _____

28   [4] The Court uses the terms "optometry exam" and "optometry appointment" interchangeably in
     this order.

Mr. Li was released from jail in or about May 2017.  Docket No. 30.

### III.  VENUE AND JURISDICTION

Venue is proper in the Northern District of California because the events or omissions giving rise to the complaint occurred at a jail in Contra Costa County, which is located within the Northern District.  *See* 28 U.S.C. §§ 84, 1391(b).  The Court has federal question jurisdiction over this action brought under 42 U.S.C. § 1983.  *See* 28 U.S.C. § 1331.

### IV.  LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is proper where the pleadings, discovery and affidavits show that there is "no genuine dispute as to any material fact and [that] the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  A fact is material if it might affect the outcome of the lawsuit under governing law, and a dispute about such a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

In a typical summary judgment motion, a defendant moves for judgment against plaintiff on the merits of his claim.  In such a situation, the moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine dispute of material fact.  The burden then shifts to the nonmoving party to "go beyond the pleadings, and by his own affidavits, or by the 'depositions, answers to interrogatories, or admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  *Celotex*, 477 U.S. at 324.

A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is based on personal knowledge and sets forth specific facts admissible in evidence.  *See Schroeder v. McDonald*, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's verified complaint as opposing affidavit where, even though verification not in conformity with 28 U.S.C.  § 1746, plaintiff stated under penalty of perjury that contents were true and correct, and allegations were

8

not based purely on his belief but on his personal knowledge). Mr. Li's complaint is made under penalty of perjury, so the facts therein are considered in the adjudication of the summary judgment motion.

The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. *See T.W. Elec. Serv. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The evidence must be viewed in the light most favorable to the nonmoving party, and inferences to be drawn from the facts must be viewed in a light most favorable to the nonmoving party. *See id*. at 631.

## V.   **DISCUSSION**

A.   The Complaint Is Deemed Amended To Include A *Monell* Claim For Delayed Optometry Appointments

The complaint alleged that Contra Costa County violated Mr. Li's Eighth Amendment rights by "condon[ing] an unofficial practice and policy of not providing pain medications when requested by . . . inmates." Docket No. 1 at 3. That was the claim for which the Court ordered service of process on Contra Costa County. Docket No. 5 at 2-3. Nonetheless, the parties have included arguments in their summary judgment briefs about liability under *Monell v. Dep't of Social Servs.,* 436 U.S. 658, 690 (1978), for both that policy *and* a policy of delayed access to optometry exams. Defendants' briefs defended against the claim based on a policy of delayed access to optometry exams (as well as the pain medication policy). Defendants argued in their motion that "the undisputed evidence fails to establish that the County had a policy that violated Plaintiff's Eighth Amendment rights *due to the length of time for his optometry appointment.*" Docket No. 20 at 20 (emphasis added). And Defendants argued in their rebuttal brief that "Plaintiff's sur-reply offers no actual evidence as to his claim that the County's policies for administering pain medication *and scheduling optometry appointments were deliberately indifferent to his serious medical needs.*") Docket No. 37 at 2-3 (emphasis added)). Plaintiff also submitted argument about both the policy involving pain medications and the policy of delayed access to optometry exams. *See* Docket No. 28 at 19; Docket No. 35 at 3. Due to the fact that this *Monell* claim was not pled, but the parties have proceeded on the assumption it exists, the question

arises what to do about the claim.

It lies within the district court's discretion whether a plaintiff may expand his complaint by adding claims raised for the first time on summary judgment. *See Brass v. County of Los Angeles*, 328 F.3d 1192, 1197-98 (9th Cir. 2003) (upholding district court's finding that plaintiff waived new § 1983 arguments raised for the first time in his motion for summary judgment where nothing in his existing pleading suggested he was raising those arguments and he offered no excuse or justification for his failure to raise them earlier). As with other amendments, the factors to consider include whether there is bad faith by the plaintiff, undue delay, prejudice to the defendants, futility in amendment, and the number of prior opportunities to amend. *See Desertrain v. City of Los Angeles*, 754 F.3d 1147, 1154-55 (9th Cir. 2014) (district court abused its discretion in failing to construe plaintiff's summary judgment motion and opposition to defendants' summary judgment motion as a motion to amend complaint to add vagueness claim raised for the first time, and in failing to then allow such amendment). Federal Rule of Civil Procedure 15(a) provides that leave to amend "shall be freely given when justice so requires." This "policy is to be applied with extreme liberality." *Desertrain*, 754 F.3d at 1154 (citation omitted).

In the interest of justice, the Court will permit amendment of the complaint to include a *Monell* claim that Contra Costa County has a policy, practice or custom of long delays in the scheduling of optometry exams for inmates, and that such policy, practice or custom resulted in a violation of Mr. Li's Fourteenth Amendment right to due process. The factors to consider in determining whether to permit the amendment of the complaint weigh in favor of allowing the amendment. There does not appear to be bad faith or undue delay by Mr. Li in urging his Fourteenth Amendment claim against the County based on delayed optometry appointments, and he has not yet amended his complaint. Amending to assert the claim would not be futile, as the evidence (discussed later in this order) shows a triable issue as to whether the long waits for optometry appointments -- long waits that the County does not deny -- violated Mr. Li's Fourteenth Amendment rights. Most importantly, there does not appear to be any prejudice to the County in allowing amendment to include the claim, given that the parties have offered evidence

10

1    and argument on the issue whether Mr. Li's federal constitutional rights were violated by Contra

2    Costa County's policy, practice or custom of delayed optometry appointments for inmates.  For

3    these reasons, the Court will permit the amendment of the complaint to allege this additional claim

4    against the County.

5         Further, because the claim is so specific, it promotes judicial economy for the Court to

6    simply deem the existing complaint amended to add that claim.  This is preferable to requiring Mr.

7    Li to draft and file a proposed amended complaint because any proposed amended complaint

8    would require further screening by the Court.

9    B.    The Fourteenth Amendment Provides The Source For Mr. Li's Claims

10        In the initial review of the complaint, the Court identified Mr. Li's claims as claims that

11   Defendants had been deliberately indifferent to his serious medical needs in violation of his Eighth

12   Amendment rights.  The Court noted, however, that Mr. Li had not alleged whether he was a

13   pretrial detainee or a convict at the relevant time.  His claims would arise under the Fourteenth

14   Amendment's Due Process Clause, rather than the Eighth Amendment's Cruel and Unusual

15   Punishment Clause, if he was a pretrial detainee.  Docket No. 5 at 2 & n.2.  Mr. Li has clarified

16   that he was a pretrial detainee at the relevant time.  His claims therefore arise under the Fourteenth

17   Amendment.

18        The Court also noted in the initial review order that, "[e]ven though pretrial detainees'

19   claims arise under the Due Process Clause, the Eighth Amendment serves as a benchmark for

20   evaluating those claims.  *See Carnell v. Grimm*, 74 F.3d 977, 979 (9th Cir. 1996)."  Docket No. 5

21   at 2 n.2.  The Eighth and Fourteenth Amendment standards for conditions of confinement claims

22   no longer appear to be interchangeable, contrary to what was suggested in *Carnell*.  Since *Carnell*,

23   the Ninth Circuit has indicated that a pretrial-detainee plaintiff must show a different mental state

24   for a defendant.  Whereas the Eighth Amendment standard requires that a prisoner prove that a

25   prison official knew of and consciously disregarded an excessive risk to inmate health, the

26   Fourteenth Amendment standard requires that a pretrial detainee show that a defendant "did not

27   take reasonable available measures to abate that risk, even though a reasonable officer in the

28   circumstances would have appreciated the high degree of risk involved--making the consequences

11

of the defendant's conduct obvious." *Castro v. County of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016) (en banc), *cert. denied* 137 S. Ct. 831 (2017). *Castro* announced the objective standard in a deliberate-indifference-to-safety claim of a pretrial detainee, and the Ninth Circuit has not yet decided whether the same objective (as opposed to subjective) standard of deliberate indifference applies to a medical care claim from a pretrial detainee.[5] An objective (rather than subjective) standard of deliberate indifference should be applied to Mr. Li's medical care claims because he was a pretrial detainee at the relevant time. There is no obvious reason not to use the same objective standard of deliberate indifference in the medical-care context as that used in the failure-to-protect context in *Castro*. In any event, as explained below, the result would be the same in this case, regardless of whether the objective or subjective standard for deliberate indifference was used.

C.     The Kam Wong Case

Mr. Li relies on a case filed by another inmate who also complained of delayed eye exams and lack of pain medication at MDF, *Kam Wong v. Joy Kick*, et al., Case No. 14-cv-4760 JST (hereinafter, the "*Kam Wong* case"). There are some differences between Mr. Li's case and the *Kam Wong* case. First, Mr. Wong waited longer for his optometry appointment, as he waited seventeen months, instead of the thirteen months that Mr. Li waited. Second, Mr. Wong filed more medical request forms and medical grievance forms than Mr. Li filed. Third, Mr. Wong complained of floaters and blurred vision, which Mr. Li did not (except that Mr. Li did make his

---

[5] Indeed, recent unpublished decisions confirm that the issue remains undecided in this circuit. *See Conley v. Nielsen*, 2017 WL 3635559, at *1 (9th Cir. Aug. 24, 2017) (district court properly dismissed pretrial detainee's medical deliberate indifference claim because "under any potentially applicable standard, [plaintiff] failed to allege facts sufficient" to state a claim (citing *Castro* as well as earlier cases using subjective standard for deliberate indifference claims)); *Blankenship v. Shinn*, 2017 WL 3530900 (9th Cir. Aug. 17, 2017) (summary judgment was proper on a pretrial detainee's claim of deliberate indifference to medical needs "under any potentially applicable standard" (citing *Castro* as well as earlier case using subjective standard for deliberate indifference claims)). Other circuits have taken different approaches. *See Ryan v. Armstrong*, 850 F.3d 419, 425 n.3 (8th Cir. 2017) (citing *Castro* and declining to decide whether deliberate indifference test is now an objective test for medical care claims by pretrial detainees); *Darnell v. Pineiro*, 849 F.3d 17 (2d Cir. 2017) (citing *Castro* and holding that objective test for deliberate indifference applies to pretrial detainees' claims about conditions of confinement, such as overcrowding, sanitation problems, and inadequate nutrition); *Alderson v. Concordia Parish Corr. Facility*, 848 F.3d 415 (5th Cir. 2017) (following Fifth Circuit precedent and declining to adopt objective standard for pretrial detainee's claim of deliberate indifference to medical needs).

first complaint of blurred vision one week before his optometry exam). Fourth, Mr. Wong's wait, and eventual optometry appointment, occurred many months before Mr. Li arrived at MDF.

The *Kam Wong* case eventually was dismissed pursuant to a negotiated settlement. Prior to settlement proceedings, Judge Tigar had issued an order granting in part and denying in part a defense motion for summary judgment. *See* Docket No. 105 in *Kam Wong* case. In the order on summary judgment, Judge Tigar made the following rulings: (1) a triable issue of fact existed as to whether Mr. Wong had a serious medical need, based on evidence that he had to squint to see and that the squinting was causing him pain, blurred vision and headaches, *id.* at 15; (2) a triable issue existed as to whether the seventeen-month wait for treatment constituted deliberate indifference to that serious medical need, *id.* at 16; (3) granted summary judgment for one nurse who administered a Snellen eye chart test and made a referral to a doctor to order an optometry appointment, in response to a request for an eye exam from Mr. Wong, who was not then complaining of pain, *id.*; (4) denied summary judgment for three other nurses who promptly responded to Mr. Wong's complaints of eye pain and blurred vision, but did not examine him to assess the severity of his condition, *id.* at 16-17; (5) denied summary judgment for a doctor who reviewed a grievance twenty months after the initial referral to an optometry clinic and responded to a grievance by relying on the evaluation of a nurse who had not actually examined Mr. Wong, *id.* at 17; (6) denied summary judgment for two administrators who implemented the policy of referring inmates to optometry appointments at the understaffed medical center -- a delay that purportedly caused permanent black floaters in Mr. Wong's eyes, *id.* at 18-19; (7) granted summary judgment in favor of two administrators on Mr. Wong's failure-to-train theory, *id.* at 19; (8) granted summary judgment against Mr. Wong on his theory that Policy No. 506 (on minor discomfort) amounted to deliberate indifference to a serious medical need, *id.*; and (9) denied summary judgment for the County on the *Monell* claim that the County had a de facto policy that caused inmates to face excessive wait times for optometry appointments, *id.* at 20.

D.     Evaluation Of Defendants' Motion For Summary Judgment

When a pretrial detainee challenges conditions of his confinement, the proper inquiry is whether the conditions amount to punishment in violation of the Due Process Clause of the

13

Fourteenth Amendment. *See Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979). An inmate claiming

that prison or jail officials have responded inadequately to his medical needs must establish two

elements to state a claim under § 1983. First, he must identify an objectively serious medical

need. *See Wilhelm v. Rotman*, 680 F.3d 1113, 1122 (9th Cir. 2012) (serious medical need exists if

"failure to treat a prisoner's condition could result in further significant injury or the unnecessary

and wanton infliction of pain"). Second, he must show that a defendant acted with the requisite

mental state of deliberate indifference to the risk to the inmate's health. At the summary judgment

stage, the pretrial detainee must present evidence that a defendant "did not take reasonable

available measures to abate that risk, even though a reasonable officer in the circumstances would

have appreciated the high degree of risk involved -- making the consequences of the defendant's

conduct obvious." *Castro*, 833 F.3d at 1071. This objective standard requires the pretrial detainee

to "prove more than negligence but less than subjective intent -- something akin to reckless

disregard." *Id.*[6] Mere negligence or an inadvertent failure to provide adequate medical care does

---

[6] *Castro* cited to the Restatement of Torts § 500, comment a, as support for its articulation of this standard. *Castro*, 833 F.3d at 1071. The Restatement gives this explanation of recklessness:

> Recklessness may consist of either of two different types of conduct. In one the actor knows, or has reason to know, as that term is defined in § 12, of facts which create a high degree of risk of physical harm to another, and deliberately proceeds to act, or to fail to act, in conscious disregard of, or indifference to, that risk. In the other the actor has such knowledge, or reason to know, of the facts, but does not realize or appreciate the high degree of risk involved, although a reasonable man in his position would do so. An objective standard is applied to him, and he is held to the realization of the aggravated risk which a reasonable man in his place would have, although he does not himself have it.
>
> . . .
>
> For either type of conduct, to be reckless it must be unreasonable; but to be reckless, it must be something more than negligent. It must not only be unreasonable, but it must involve a risk of harm to others substantially in excess of that necessary to make the conduct negligent. It must involve an easily perceptible danger of death or substantial physical harm, and the probability that it will so result must be substantially greater than is required for ordinary negligence.

Restatement (Second) of Torts § 500 cmt. a (Am. Law Inst. 2016).

14

not rise to the level of a constitutional violation. *See id.*[7]

1.   Optometry Appointments

a.   Serious Medical Need

The first requirement for a due process claim in the medical care context is that there must be a deprivation of a "serious" medical need.  A serious medical need exists if the failure to treat an inmate's condition "could result in further significant injury" or the "'unnecessary and wanton infliction of pain.'" *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006).  "Indications that a plaintiff has a serious medical need include '[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain.'"  *Colwell v. Bannister*, 763 F.3d 1060, 1066, (9th Cir. 2014) (citation omitted) (monocular blindness caused by a cataract significantly affects an individual's daily activities and therefore is a serious medical need); *Koehl v. Dalsheim*, 85 F.3d 86, 88 (2d Cir. 1996) (allegation that prescription eyeglasses were required to avoid double vision and loss of depth perception that resulted from a prior head injury sufficed to allege serious medical need).  *But see Gonzales v. Rummel*, 2012 WL 1458089, *2-3 (E.D. Cal. 2012) (plaintiff's allegation that without his second pair of eyeglasses, his eyes hurt and he could not read and write "on its face appears frivolous" because he had another pair of glasses to use); *Canell v. Multnomah County*, 141 F. Supp. 2d 1046, 1057 (D. Or. 2001) (need for reading glasses did not present a serious medical need).

The evidence in the record is sufficient to show a genuine issue for trial in support of Mr. Li's claim that his need for optometric care amounted to a serious medical need.  Viewed in the light most favorable to Mr. Li, the evidence is that he had uncorrected vision of 20/100 when he

---

[7] The *objective* deliberate indifference standard from *Castro* is a more inmate-friendly standard than the *subjective* deliberate indifference standard that applies when a prisoner asserts a claim under the Eighth Amendment.  As mentioned earlier, when the Eighth Amendment's *subjective* standard applies to a claim from a convict, the prisoner must prove that a prison official knew of and consciously disregarded an excessive risk to inmate health A defendant is deliberately indifferent if he knows that an inmate faces a substantial risk of serious harm and disregards that risk by failing to take reasonable steps to abate it.  *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  For an Eighth Amendment claim, the defendant must not only "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," but he "must also draw the inference."  *Id.*.

15

took the Snellen eye chart test on January 14, 2016. With 20/100 vision, Mr. Li should be able to see clearly at 20 feet what a person with normal visual acuity would be able to see clearly at 100 feet. Mr. Li's uncorrected visual acuity was worse than that which Defendants' expert, Dr. Shah, opined was sufficient for daily living: "[f]or a typical person, 20/30 to 20/80 vision may be sufficient to function with activities of daily living." Docket No. 22 at 6. With 20/100 vision, Mr. Li's visual acuity would not suffice for him to get a driver's license in California. *See id.* (DMV's "vision screening standard is 20/40 vision with or without corrective lenses.") Further, there is a medical record that seems to indicate that one doctor noted "profound vision impairment" in one of Mr. Li's eyes on January 15, 2016. Although the date on that record seems to be wrong (because Mr. Li's left eye injury did not occur until eleven months later), a reasonable jury could believe that the doctor made that note on January 15, 2016. On the evidence in the record, a reasonable jury could find the requirement of a serious medical need for a Fourteenth Amendment claim satisfied.

There is evidence that Mr. Li could see better (i.e., he had corrected vision of 20/40) with prescription glasses, but those were glasses he had borrowed from another inmate. His use of borrowed glasses does not mean that his need for optometric care was not a serious medical need. An inmate who borrows the assistive device he requests is not without need for the device -- e.g., an inmate who borrows crutches to get to an appointment for a broken leg may still need jail staff to provide crutches to him, and it is not the case that he does not have a serious medical need for crutches just because he has borrowed crutches that day. There also is no evidence that borrowing someone else's glasses for viewing at a distance displaces the need for optometric care for the borrower.

That Mr. Li was wearing borrowed glasses is certainly an unusual fact, and may well have contributed to the delays in scheduling his optometry appointment. Mr. Li's use of borrowed glasses may matter under the deliberate indifference portion of the test. The trier of fact could determine whether jail officials thought Mr. Li's vision was being tested with Mr. Li's own glasses or whether it would have been obvious to reasonable jail officials that those were someone else's glasses that he had borrowed for the exam. If jail officials believed the patient was wearing

his own glasses and simply needed to update the prescription to address worsening vision -- so that they were dealing with a patient who had 20/40 corrected vision as opposed to a patient who had 20/100 vision (but had borrowed someone else's glasses) -- a trier of fact might determine that jail officials were not deliberately indifferent.

### b. Claim Against Contra Costa County

There is no liability under 42 U.S.C. § 1983 based on a respondeat superior theory; thus, "a municipality cannot be held liable *solely* because it employs a tortfeasor." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978)). "A government entity may not be held liable under 42 U.S.C. § 1983 unless a policy, practice, or custom of the entity can be shown to be a moving force behind a violation of constitutional rights." *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (citing *Monell*, 436 U.S. at 694). "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 61 (2011).

A "policy" can be one of action or inaction. *Fairley v. Luman*, 281 F.3d 913, 918 (9th Cir. 2002) (police department's failure to create any procedures to alleviate problem of detaining the wrong individuals on a warrant even though it knew that the problem was "not uncommon," constituted a policy for which the police department could be liable under *Monell*); *see, e.g., Gant v. County of Los Angeles*, 772 F.3d 608, 619 (9th Cir. 2014) (public entity can be liable under the Fourteenth Amendment for failing to institute procedures for decreasing risk of erroneous detention); *Jackson v. Barnes*, 749 F.3d 755, 763 (9th Cir. 2014) (allegations that sheriff's department's failure to supervise the practices of its deputies despite knowing that deputies routinely deprived suspects of *Miranda* warnings as a ploy to elicit confessions sufficient to state a plausible claim of a policy of inaction).

Viewed in the light most favorable to Mr. Li, the evidence shows a genuine issue for trial in support of his claim that Contra Costa County has a custom, policy or practice of delayed optometry appointments for inmates that violated his Fourteenth Amendment rights. First, the County's written vision care policy itself mentions long waits for optometry appointments, as it

included a directive for health care providers to "[a]dvise the patient it can take several months to get an appointment with optometry if the MD orders one." Docket No. 23-1 at 2. This was not generic information to be given to all inmates, but instead was the information to be given to an inmate-patient who staff had determined met the criteria for referral to the optometry clinic. *Id.* In other words, once the inmate-patient cleared the hurdle of showing he needed an exam, he would be told it could take several months to get an appointment for that exam. That written policy, with its cautionary note about long waits, had been in effect for years: the policy was last revised in June 2013, and was still in effect during Mr. Li's stay at the jail in 2015 through 2017. The significance of the written policy is not that it commanded that there must be long waits for optometry appointments; instead, the significance is that the written policy's acknowledgement that inmates must be reminded of long delays supports a finding that there was an unwritten policy, practice or custom of long delays before inmates obtained optometry appointments. A reasonable trier of fact could conclude from this evidence that, for more than three years, the County anticipated that it would take several months for a patient who qualified for an optometry exam to obtain such an exam.

Second, Mr. Li presents evidence that he waited thirteen months for his optometry appointment and that fellow inmate Kam Wong waited seventeen months for his optometry appointment a year earlier. Although the experience of just two inmates might not be enough to demonstrate a practice, policy or custom, here there was more: as mentioned in the preceding paragraph, the County's written policy acknowledged it would take several months to obtain an optometry appointment.

Defendants present evidence that the optometry clinic was an "impacted" clinic, meaning that the waiting times for appointments grew as more people needed optometry appointments. While this may explain what was going on, it does not excuse it. Individual health care providers (such as doctors and nurses who referred their patients to the clinic) may be able to avoid liability for damages by pointing to the extremely limited resources with which they had to work. But that does not help the County avoid liability because, unlike individual health care providers, the County does control County spending. The County could choose to spend more to relieve the long

1    waits for the optometry clinic by, e.g., hiring more optometrists.

2         Defendants also point out that inmates are put in the same line as unincarcerated people

3    seeking optometry appointments at CCRMC.  But that does not show that the policy and practice

4    of long waits for inmates in need of optometry appointments is constitutional.

5         Mr. Li presents evidence in his sur-reply showing that some inmates wait many months for

6    optometry appointments. Docket No. 35 at 6-7.  The evidence is a list that appears to show when

7    optometry appointments were ordered, scheduled and conducted for inmate-patients whose names

8    have been redacted.  The evidence shows that many inmate-patients experienced multi-month

9    delays in obtaining optometry appointments.  Defendants object that the evidence is improper

10   because its use violates a protective order in the *Kam Wong* case.[8]  Defendants' purported outrage

11   at the violation of a protective order rings hollow because the evidence is already in the public

12   record due to  Defendants' inclusion of it as an unsealed exhibit in the *Kam Wong* case.  *See*

13   Docket No. 97-3 at 7-8 in the *Kam Wong* case.

14        Defendants also object to the same list on the ground that the list is irrelevant in this action.

15   Docket No. 37 at 3.  That objection is not persuasive because the list does have some relevance to

16   Mr. Li's claim about the delayed optometry exams.  The list shows very long waits for some

17   inmates to obtain optometry exams, and does tend to support Mr. Li's assertion that the County

18   has a policy, practice or custom of delayed optometry care for inmates.  The list does not cover the

19   time period (from November 2015 until February 2017) during which Mr. Li waited for his

20   optometry exam, but does include fairly recent information (from 2014) that tends to support his

21   claim.  The list shows multi-month waits for some inmates for eye exams in 2014.  The probative

22   value of the information diminishes as the dates get further away from the time period during

23   which Mr. Li was waiting for his optometry exam, but that does not deprive the list of all

24   relevance.

25        Defendants further object that the list is inadmissible because Mr. Li lacks personal

26   knowledge as to the contents of the list.  They are correct that Mr. Li has not shown that he has

27

28   [8] If Defendants do want to litigate whether a protective order in the *Kam Wong* case was violated,
     the appropriate place to assert their argument is in the *Kam Wong* case.

personal knowledge of the contents of the list. But it appears that Mr. Li could present comparable evidence in proper form because he should have received it during discovery. Several months ago, the Court ordered Defendants to provide to Mr. Li lists of inmates who requested optometry services for the time period of January 1, 2014 through January 31, 2017, showing "the date that the inmate/patient first requested an optometry appointment and the date that the inmate/patient was seen by the optometrist." Docket No. 32 at 9.

Where, as here, a party has failed to properly support an assertion of fact in presenting or opposing a motion for summary judgment, the court has various options, including "giv[ing] the party an opportunity to properly support or address the fact," or "issue any other appropriate order." Fed. R. Civ. P. 56(e). Here, the Court will issue this order ruling on the motion for summary judgment, excluding from its consideration the list of waiting times for various inmate-patients.

Even without that list, viewing the evidence and reasonable inferences therefrom in the light most favorable to Mr. Li, a triable issue exists as to whether the County has a policy, practice or custom of long delays for inmates to obtain optometry exams.

Deliberate indifference may appear when prison or jail officials delay treatment for a serious medical need. *See McGuckin v. Smith*, 974 F.2d 1050, 1062 (9th Cir. 1992), *overruled on other grounds, WMX Technologies, Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc) (delay of seven months in providing medical care during which inmate's herniated disk was left virtually untreated and plaintiff was forced to endure "unnecessary pain" sufficient to present colorable § 1983 claim); *see also Gibson v. County of Washoe*, 290 F.3d 1175, 1189 (9th Cir. 2002), *overruled on other grounds, Castro v. County of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016) (en banc) (jury could find deliberate indifference in county jail's policy of delaying medical screening for combative, uncooperative, or unintelligible intoxicated persons, particularly because certain medical conditions cause that behavior). Here, the long delays in scheduling optometry appointments for inmates resulted in inmates being vision-impaired for many months, and inmates being deprived of glasses needed for adequate vision to engage in normal activities of daily living. In Mr. Li's particular case, there is evidence from which a jury could conclude that deliberate

indifference is shown because, as a result of the policy, practice and custom of lengthy delays in scheduling appointments, Mr. Li had to function for more than a year with uncorrected vision worse than that considered "sufficient to function with activities of daily living," and with "profound vision impairment [in] one eye." Docket No. 22 at 6; Docket No. 28 at 32. A reasonable jury could find that such policy, practice and custom of delayed optometry appointments amounted to deliberate indifference to a serious medical need.

Mr. Li argues that his eyesight worsened from 20/100 to 20/200, uncorrected, as a result of the delay in receiving an optometry appointment. There is no competent evidence that the wait for an optometry appointment *caused* any deterioration in his eyesight.

Even without the evidence of his allegedly worsening vision, however, there is sufficient evidence to show a triable issue that he was harmed as a result of the policy of delayed appointments: Mr. Li had to live without proper corrective lenses for 13 months; he had to function with eyesight worse than that considered acceptable for normal activities of daily living. Mr. Li also states that he experienced pain as a result of not having properly corrected vision.

The County of Contra Costa is not entitled to summary judgment in its favor on the *Monell* claim that there was a policy, practice or custom of delayed optometry appointments for inmates.

> c.    Claim Against County Health Administrator Sam Rosales

A supervisor may be liable for a violation of a constitutional right under § 1983 even without overt personal participation in the violation if the supervisor implemented a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force of the constitutional violation, *Redman v. County of San Diego*, 942 F.2d 1435, 1446 (9th Cir. 1991), *abrogated on other grounds by Farmer v. Brennan*, 511 U.S. 825, 834 (1994), or if the supervisor set in motion a series of acts by others which the supervisor knew or reasonably should have known would cause others to inflict the injury, *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011). *See, e.g., Dubner v. City & County of San Francisco*, 266 F.3d 959, 968 (9th Cir. 2001) (chief of police may be held liable in his individual capacity on unlawful arrest claim where there was evidence that (1) it was common practice in police department to use citizen's arrest forms without specifying who should be arrested and for what violation; (2) officers were trained to use the

citizen's arrest forms in this way; and (3) it was common knowledge that the forms were used in this way).

Viewing the evidence in the light most favorable to Mr. Li, there exists a genuine issue for trial in support of his claim that Mr. Rosales was deliberately indifferent to his serious eye care needs. Mr. Rosales received Mr. Li's May 3, 2016 inmate grievance complaining that Mr. Li had been waiting for an optometry appointment for six months, and that his eyes were starting to hurt and he was experiencing headaches due to eye strain. Mr. Rosales responded by informing Mr. Li that "there are long wait times for all patients to get appointments at the County's Optometry Clinics." Docket No. 28 at 67. Mr. Rosales' response evinced an attitude of acceptance of the status quo. There is no indication in his response to the grievance that Mr. Rosales planned to do anything to hurry up those waiting times, and instead all indications are that his only intent was to relay to the inmate that the waiting times were long. *See id.* His declaration also acknowledges that there are "long waiting periods for patients with routine needs" for optometry exams under the vision care policy. Docket No. 23 at 5.

Unlike the nurses and doctors working within this slow-moving system, Mr. Rosales apparently was responsible for the slow-moving system. He declares that he is "the Health Services Administrator for Detention Health Services and the liaison between the Sheriff's Office and Health Services regarding the provision of health services in the County's detention facilities." Docket No. 23 at 1. His responsibilities include "administrative oversight of detention health operations." *Id.* He "assist[s] in assuring quality and accessibility of health services provided in the County's detention facilities." *Id.* at 1-2. He also "develop[s] and oversee[s] the updates of policy for the administration of health care in the detention setting." Docket No. 23 at 2. In short, the evidence, viewed in the light most favorable to Mr. Li, would allow a reasonable trier of fact to determine that Mr. Rosales was responsible for a policy that was the moving force in the violation of Mr. Li's constitutional rights.

As discussed in the preceding section on municipal liability, Mr. Li presented evidence that he was harmed by the long waits for optometry care: for many months, Mr. Li had to function without proper corrective lenses, and he had eye strain and headaches as a result.

**United States District Court**
For the Northern District of California

Viewing the evidence in the light most favorable to Mr. Li, there is a genuine dispute as to whether Mr. Rosales was deliberately indifferent to Plaintiff's serious medical needs in crafting and implementing the policy for inmate optometry appointments that resulted in long delays before inmates received optometry exams.

2.   Pain Medications

Mr. Li has failed to show a genuine issue for trial in support of his claim that Defendants were deliberately indifferent to his need for pain medications.  He fails on both requirements for a Fourteenth Amendment claim.

The claim fails on the first prong because Mr. Li has not presented evidence that his complaints of pain amounted to a serious medical need.  Pain can come in a wide range of severities -- from the slight pain of a paper cut to the extreme pain of a traumatic amputation -- and Mr. Li presents no evidence that he experienced pain that was anything more than trivial and slight.  On the barren record now before the Court, no reasonable trier of fact could conclude that Mr. Li's complaints of pain amounted to a serious medical need.

Even if his complaints of pain amounted to a serious medical need, the claim fails on the mental state prong because there is no evidence that any Defendant was deliberately indifferent. The undisputed evidence shows that the County had a policy for addressing inmates' complaints of minor discomfort; the policy called for inmates to obtain from the commissary over-the-counter medications like Tylenol and ibuprofen to deal with minor pain complaints; and the policy provided that indigent inmates could obtain the medications from the commissary even if they did not have funds to pay for them.  The evidence is undisputed that Mr. Li was informed of this policy.  There is no evidence that Mr. Li attempted to buy Tylenol or ibuprofen.  And there is no evidence that Mr. Li was not allowed to buy those medications.  There also is no evidence that those medications would not have sufficed to relieve whatever pain he was experiencing.

Mr. Li takes the position that medical staff had to *give* him medications if he complained of pain, and that he should not have been burdened with buying his own pain medications.  *See* Docket No. 28 at 13-14.  The law is otherwise.  It does not offend the Constitution for prison and jail officials to require inmates to pay for some of the costs of their medical care, so long as

indigent inmates are not denied medical care due to their indigence.  *See Shapley v. Nevada Board of State Prison Comm'rs.*, 766 F.2d 404, 408 (9th Cir. 1985) (in the absence of any evidence inmate was denied medical care due to inability to pay, prison policy requiring inmate to pay $3.00 copay did not amount to deliberate indifference to his medical needs); *see, e.g., Morris v. Livingston*, 739 F.3d 740, 746-47 (5th Cir. 2014) (no Eighth Amendment violation in health care system pursuant to statute that provided that Texas inmates must pay a $100.00 annual health care services fee when they receive medical treatment in the prison system (and allowed a negative balance on trust account, with deductions of 50% from future deposits, for any inmate who wanted medical care but was indigent)); *Poole v. Isaacs*, 703 F.3d 1024, 1027 (7th Cir. 2012) (regulation providing for imposition of $2.00 copayment from inmates whose trust fund balance met or exceeded that amount did not violate Eighth Amendment; "the imposition of a modest fee for medical services, standing alone, does not violate the Constitution," so there was no *per se* unconstitutionality); *id.* (no Eighth Amendment violation where prisoner who "had sufficient funds in his trust account but opted to refuse treatment rather than part with his money.  Even though he was in pain until he received treatment, the delay in receiving care was of his own making."); *Tijerina v. Patterson*, 507 F. App'x 807, 810 (10th Cir. 2013) (no Eighth Amendment violation in prison policy requiring that inmates pay $5.00 copayment for medical visits and a $2.00 dispensing fee for medications, but also providing that inmates may not be denied medical care due to a lack of funds); *id.* (although a state must provide inmates with basic medical care, "we are not aware of any authority suggesting such care must be provided free of charge with respect to prisoners who have the ability to pay"); *Reynolds v. Wagner*, 128 F.3d 166, 173-75 (3rd Cir. 1997) (charging inmates who can pay for medical care does not violate Eighth or Fourteenth Amendment); *Martin v. Debruyn*, 880 F. Supp. 610, 614 (N.D. Ind. 1995) ("Nothing in the Eighth Amendment . . . requires a state to provide an inmate, free of charge, with a necessary commodity that would not be free outside the prison walls and which the inmate has the legal means to obtain").  *Cf. Shinault v. Hawks*, 782 F.3d 1053, 1060-61 (9th Cir. 2015) (prison officials' decision to freeze and withdraw $65,000 of the $107,416 in inmate's trust account for costs of incarceration did not violate his Eighth Amendment rights; even though he intended to use the

funds to secure medical treatment for his diabetes following his release from prison, the "right to medical care has never shielded an inmate's assets because they could potentially be used for medical purposes after release from incarceration").

Mr. Li next argues that buying over-the-counter medications at the commissary was unacceptable because commissary orders were delivered only once a week. He urges that commissary orders were delivered on Thursday nights, so that an inmate might have to wait several days to receive pain relievers depending on the day of his request. Docket No. 28 at 7-8. There is no evidence that Mr. Li ever was made to wait a full week to obtain pain medications from the commissary. The only evidence in the record suggests otherwise. Mr. Li submitted the inmate appeal on May 3, 2016 (a Tuesday), and Mr. Rosales responded on May 4, 2016 (a Wednesday). Mr. Li does not state that he ever attempted to obtain medications from the commissary, let alone explain why he could not have received medications that Thursday if he had followed Mr. Rosales' directions in the inmate appeal response. Moreover, Mr. Li does not dispute that the written policy specifically allowed for medical staff to provide over-the-counter pain medication in cases where there was an acute or urgent condition and it was unacceptable to wait for the medication until the next commissary day.

Viewing the evidence in the light most favorable to Mr. Li, he has failed to raise a genuine issue of fact in support of his claim that the County of Contra Costa had a policy, practice or custom of denying pain medications that resulted in a violation of Mr. Li's constitutional rights.

Viewing the evidence in the light most favorable to Mr. Li, he also has failed to raise a genuine issue of fact in support of his claim that Mr. Rosales was deliberately indifferent to Mr. Li's need for pain medications. Mr. Li agrees that he received Mr. Rosales' response to the inmate grievance that informed Mr. Li of the availability of pain medications at the commissary. Docket No. 28 at 7. And Mr. Li agrees that a nurse spoke to him in person the next day to be sure he understood the response. *Id.* Mr. Li simply thinks that the pain medications should have been *given* to him. As explained above, the Constitution does not prohibit a system that requires inmates to pay for their medications and medical care, so long as indigent inmates are not denied medical care due to their inability to pay. Mr. Rosales is entitled to judgment as a matter of law

25

on Mr. Li's claims that Mr. Rosales was deliberately indifferent in responding to Mr. Li's complaints of pain. Mr. Rosales also is entitled to judgment as a matter of law on Mr. Li's claims that Mr. Rosales was deliberately indifferent in creating and/or implementing the County's minor discomfort policy that called for inmates to purchase over-the-counter pain medications like Tylenol and ibuprofen.

Viewing the evidence in the light most favorable to Mr. Li, nurse Dhanoa is entitled to judgment as a matter of law on Mr. Li's claims that nurse Dhanoa was deliberately indifferent in responding to Mr. Li's complaints of pain. Mr. Li contends that "no pain medications were provided" when he complained of pain to nurse Dhanoa in or about November 2015. Docket No. 1 at 3. His claim falters because he has not presented any evidence that would allow a jury to conclude that he had a *serious* medical need for pain relief medications when nurse Dhanoa allegedly failed to give him pain medications. Mr. Li also presents no evidence that he was unable to buy over-the-counter pain medications to address his pain when he complained to nurse Dhanoa. *See generally Edmundson v. Bowen*, 2014 WL 4104132, at *4 (D. Mont. 2014), *aff'd sub nom. Edmundson v. Flathead County Sheriff Dep't*, 654 F. App'x 264 (9th Cir. 2016) (granting summary judgment for defendant nurse where parties disagreed as to whether nurse ignored inmate at morning pill call, thus depriving him of two extra-strength Tylenol pills, but it was undisputed that plaintiff could have obtained Tylenol from the commissary).

E.    Unserved Defendants Are Dismissed

In an order filed June 12, 2017, the Court noted that three of the six Defendants had not been served with process or appeared in this action. Specifically, Defendants nurse Joy Kick, nurse Felisa, and Dr. Dennis McBride had not been served with process or appeared in this action. The court explained that the Marshal had been unable to locate those defendants with the information provided by Mr. Li, and service therefore had not occurred within the time limits set out in Federal Rule of Civil Procedure 4(m). Docket No. 32 at 2-3. The Court ordered that, no later than July 21, 2017, Mr. Li had to further identify nurse Felisa and had to provide an address at which each of the three unserved Defendants may be served with process. *Id.* at 4. The Court further noted that, in the alternative to providing the information, Mr. Li had to show cause by the

deadline why he had not provided the information needed to locate the unserved Defendants and serve process on them. *Id.* at 4. The Court cautioned that the unserved Defendants would be dismissed if Mr. Li failed to provide sufficient information to enable service of process to be accomplished or show cause for his failure to provide the information. *Id.*

Mr. Li did not provide any information to identify nurse Felisa, did not provide an address at which any of the three unserved Defendants could be served, and did not show cause for his failure to provide that information. Accordingly, nurse Felisa, nurse Joy Kick, and Dr. Dennis McBride are DISMISSED from this action without prejudice.

F.      Referral To *Pro Se* Prisoner Mediation Program

The Court has granted summary judgment on some claims. There remains for adjudication Mr. Li's Fourteenth Amendment claims against County of Contra Costa and Mr. Rosales based on the delayed optometry appointments. This case appears a good candidate for the court's mediation program. Although Mr. Li is no longer in custody, it is appropriate to send this case to the *Pro Se* Prisoner Mediation Program because Mr. Li apparently is still awaiting sentencing.

Good cause appearing therefor, this case is now referred to a Magistrate Judge for mediation or settlement proceedings pursuant to the *Pro Se* Prisoner Mediation Program. The proceedings will take place within one hundred twenty days of the date this order is filed. The Magistrate Judge will coordinate a time and date for mediation or settlement proceedings with all interested parties and/or their representatives and, within five days after the conclusion of the proceedings, file with the Court a report for the prisoner mediation or settlement proceedings.

## VI.      **CONCLUSION**

For the foregoing reasons, Defendants' motion for summary judgment is **GRANTED IN PART and DENIED IN PART**. Docket No. 20. Defendants County of Contra Costa, Sam Rosales and nurse Dhanoa are entitled to judgment as a matter of law on Mr. Li's claim that his right to due process was violated by the failure to provide pain medications. Defendants County of Contra Costa and Sam Rosales are *not* entitled to judgment as a matter of law on Mr. Li's claim that his right to due process was violated by the delay in scheduling his optometry appointment. No claim was made against nurse Dhanoa regarding the delay in scheduling the optometry

27

1   appointment.

2   Defendants nurse Felisa, nurse Joy Kick, and Dr. Dennis McBride are **DISMISSED** from

3   this action without prejudice.

4   This action is now referred to a Magistrate Judge for mediation or settlement proceedings

5   pursuant to the *Pro Se* Prisoner Mediation Program. The Clerk shall send a copy of this order

6   upon referral to a Magistrate Judge for mediation or settlement proceedings.

7

8   **IT IS SO ORDERED**.

9

10  Dated: October 24, 2017

11  _____

12  EDWARD M. CHEN
    United States District Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28